IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DOLORES SAMUEL, individually and on behalf | § | |
| of the estate of JULIUS PAYE KEHYEI, | § | |
| DECEDENT, KYLE SAMUEL and | § | |
| MAYA THORN as NEXT FRIEND OF MINOR, | § | |
| S.T., | § | |
| | § | |
|     Plaintiffs, | § | |
| | § | CIVIL ACTION NO. 4:22-cv-2900 |
| v. | § | JURY TRIAL DEMANDED |
| | § | |
| CITY OF HOUSTON, TEXAS, | § | |
|  K. DREY, *Individually*, and JOHN DOE HPD | § | |
| OFFICERS 1-10, | § | |
| | § | |
| | § | |
|     Defendants. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

COMES NOW, Dolores Samuel, individually and on behalf of the Estate of Julius Paye Kehyei, Kyle Samuel and Maya Thorn as Next Friend of S.T., the minor daughter of Julius Paye Kehyei ("Kehyei") deceased, complaining of Defendants the City of Houston, Texas, more particularly the Houston Police Department ("HPD"), K. Drey ("Drey"), in his individual capacity, and John Doe HPD Officers 1-10 in their individual capacity, and for cause would show the Honorable Court as follows:

This is an action brought by the Plaintiffs against Defendants for Drey's and John Doe HPD Officers 1-10's use of excessive and deadly force under the color of law resulting in the death of Julius Paye Kehyei in violation of his rights under the Fourth Amendment of the United States Constitution secured pursuant to 42 U.S.C. § 1983.

**PLAINTIFFS' ORIGINAL COMPLAINT** – Page 1

Defendant Drey and John Doe HPD Officers 1-10, contrary to Drey's false statements, were not facing an immediate threat of death or serious bodily injury when they violated then twenty-nine (29) year old Kehyei's Fourth Amendment right to be free from excessive and deadly use of force. These violations were committed because of the policies and/or customs or lack thereof of the City of Houston, Texas (the "City").

Plaintiffs herein comply with the pleading requirements of FRCP Rule 8(a)(2) and the requirements of *Ashcroft v. Iqbal*, 556 U.S. 129 S.Ct. 1937, 1949 (2009) that "a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

## I.

## <u>NATURE OF THE ACTION</u>

1.     This is an action brought by the Plaintiffs against Defendants, the city of Houston, Texas, Drey and John Doe HPD Officers 1-10, for their use of excessive and deadly force resulting in the death of Kehyei under the color of law, in violation of his individual rights under the Fourth Amendment of the United States Constitution and, consequently, in violation of his civil rights pursuant to 42 U.S.C. § 1983 and § 1985.  Furthermore, Plaintiffs are entitled to recover damages arising from the decedent's wrongful death as applied under 42 U.S.C § 1983 and all other applicable laws complaining of the various acts listed below and for their wrongful death cause of action.

2.     The Plaintiffs allege that Mayor Sylvester Turner, the city council and  then Houston Police Department Chief Art Acevedo[1], the City's final policymakers for the HPD

---

[1]     Troy Finner became Chief of Police, upon Chief Acevedo's departure, in April 2021.

(collectively referred herein as the "Policymakers"), vested with all powers of the City and with the determination of all matters of policy, vested with the authority for setting policies for city of Houston Police Officers, had a duty, but failed to implement and enforce such policies, practices and procedures for HPD that respected Kehyei's constitutional rights to protection and equal treatment under the law. The Policymakers implemented a use of force policy that is facially unconstitutional and failed to properly train, supervise, screen, discipline, transfer, counsel or otherwise control officers who are known, or who should have been known, to engage in the use of excessive force, including those officers repeatedly accused of such acts.

3.      The Policymakers' failure to implement the necessary policies and the (de facto) implementation of unconstitutional policies, including policies for use of force and use of deadly force, unnecessarily caused Kehyei to die at the hands of a police officer who engaged in the excessive and deadly use of force when Kehyei did not pose an imminent threat to the officers or others, and in any event, there were reasonable alternatives to eliminate or alleviate the potential threat. Defendants City and then Chief Acevedo's failure to implement the necessary policies and the implementation of facially unconstitutional policies deprived Kehyei of his rights under the Constitution and caused him unwarranted and excruciating physical pain and eventual death and caused Plaintiffs' mental anguish.  Defendants Drey and John Doe HPD Officers 1-10 consciously disregarded the rights of Kehyei, knowing that the Policymakers would ratify and/or approve of their actions.  For these civil rights violations and other causes of action discussed herein, Plaintiffs seek answers and compensation for damages.

## II.

## PARTIES

4.      DOLORES SAMUEL, individually and on behalf of the Estate of Julius Paye

Kehyei, is a resident of Harris County, Texas. Mrs. Samuel is the mother of Julius Paye Kehyei. No administration of the Estate of Julius Paye Kehyei is pending, and none is necessary. Plaintiff Dolores Samuel is therefore filing this wrongful death and survival action on behalf of the Estate of Julius Paye Kehyei, pursuant to Tex. Civ. Prac. & Rem. Code §71.021.

5.      KYLE SAMUEL, a resident of Harris County, Texas, is the father of Kehyei.

6.      MAYA THORN as Next Friend of S.T., the surviving daughter of Kehyei, is a resident of Harris County, Texas, and brings this wrongful-death action.

7.      Defendant CITY OF HOUSTON, TEXAS is a municipality existing under the laws of the State of Texas and situated mainly in Harris County.  The City, through its Mayor, Sylvester Turner, appoints the Chief of Police who must be confirmed by the City Council.  The Chief, with the approval of the Mayor, is responsible for HPD's general orders, policies, procedures, and customs, as well as the acts and omissions, challenged by this suit. HPD is also responsible for preventive, investigative, and enforcement services for all citizens of Houston. All actions that form the basis of this lawsuit were performed pursuant to general orders, policies and procedures, customs and practices of Defendant, City. The City has a responsibility and duty to promulgate, implement, train, and enforce policies and procedures related to use of force and use of deadly force that meets minimum constitutional and statutory requirements.  The City may be served with citation for service of process on the City of Houston Secretary at 901 Bagby, Houston, Texas 77012.

8.      Defendant, K. DREY (hereinafter, sometimes "Officer Drey"), *Individually*, upon information and belief, is a resident of Harris County, Texas, and, at all times material herein was a police officer with HPD, allegedly acting in the course and scope of his employment.  At all times relevant to this lawsuit, it was Officer Drey's duty and responsibility to treat all persons

in compliance with constitutional and statutory requirements and in compliance with HPD's rules, regulations, policies and procedures, customs and/or practices.  Drey is being sued in his individual capacity.  Defendant Drey may be served with citation at the Houston Police Department, 1200 Travis Street, Houston, Texas or wherever he may be found.

9.      Defendant DOE HPD OFFICERS 1-10 (hereinafter, sometimes "John Doe Officers") are those HPD officers involved in any civil rights violation of the Plaintiffs, including the killing of Julius Paye Kehyei, whose identity has not yet been determined due to the City's refusal and/or failure to provide the requested information regarding the incident, pursuant to a Public Information Request.  Once identified, they may be served at 1200 Travis Street, Houston, Texas or wherever they may be found.

10.     Where appropriate, Defendant Drey and the John Doe Officers 1-10 are referred to collectively as "Defendant Officers."

### III.

### JURISDICTION AND VENUE

11.     42 U.S.C. §1983 and 42 U.S.C. §1988 provide jurisdiction over Plaintiff's constitutional claims for redress, which are conferred on this Court by 28 U.S.C. §1343(a)(3).

12.     Federal question jurisdiction is conferred on this Court by 28 U.S.C. §1331, because this action arises under the Constitution and laws of the United States.

13.     This Court also has pendant jurisdiction over all other claims asserted under the laws of the State of Texas, pursuant to 28 U.S.C. §1367(a).

14.     Venue is proper in this Court, under 28 U.S.C. §1391(b), because the incident at issue took place in Harris County, Texas within United States Southern District of Texas.

### IV.

## DUTY AND LAW APPLICABLE

15.     Kehyei was subjected to excessive and deadly force, a violation of his rights guaranteed to him by the Fourth Amendment of the United States Constitution.

16.     Plaintiffs commence this action pursuant to 42 U.S.C. §1983, which provides in relevant part for redress for every person within the jurisdiction of the United States for the deprivation, under color of state law, of any rights, privileges, or immunities secured by the Constitution and laws of the United States.

17.     The Defendant Officers were acting under the color of law and are liable under 42 U.S.C. § 1983 for their excessive and deadly acts towards Kehyei.

**V.**

## FACTS

### Kehyei's Fatal Encounter with the Defendant Drey and other Officers

18.     On August 26, 2020, Officers from the HPD Central Patrol Division were allegedly responding to a suspicious person call but did not receive many details as to the person they were looking for.  Upon information and belief, at the time the officers arrived on the scene Kehyei was observed running so the HPD police officers, without knowing the identity of the person running, chased Kehyei, who was unarmed, on to the property of a church located at the 1300 block of Hyde Park Street in Montrose.

19.     Upon information and belief, Kehyei was near or on a fence in the church yard.

20.     After talking to Kehyei for some time, Defendant Drey, a Special Weapons and Tactics Team (SWAT) officer, shot Kehyei with a single shot at approximately 5:20 a.m. for no lawful and/or justified reason.  At no time did Kehyei threaten Drey or any other person. At no

time did Kehyei fire or display a gun.  After being shot, Kehyei fell to the ground and was clearly experiencing excruciating pain.

21.     Paramedics finally arrived and Kehyei was taken to Memorial Hermann Hospital where he was later pronounced dead.

22.     In a news conference the same morning of the fatal shooting, Chief Acevedo indicated that the area had been secured and that after Kehyei was shot, he did not have a gun on his person nor was a gun found at the scene.  There are no reports that Kehyei was observed tossing anything after the shooting and had he, it would have been observed by the officers who were on the scene.

23.     To date, upon information and belief, no gun allegedly possessed by Kehyei was found at the scene despite the fact that there were numerous officers on the scene to secure it.

## THE CITY'S POLICIES, CUSTOMS AND PRACTICES

24.     Based on the evidence, Defendant Drey fired a single deadly shot hitting Kehyei for no lawful or justifiable reason.  Defendant Drey's actions were based on his lack of proper and/or adequate training in dealing with a situation like he was faced with.

25.     Contrary to his statement, Defendant Drey was not facing or reacting to an imminent threat of death or serious bodily injury to him or any other person at the time Defendant Drey fired at and killed Kehyei.

26.     This horrible tragedy was 100% preventable and only occurred because of the Defendant Drey's failure to act in an objectively reasonable manner.

27.     Defendant Drey unlawfully shot and killed Kehyei although he and the other officers were not in imminent danger and less-lethal alternatives were available.

**PLAINTIFFS' ORIGINAL COMPLAINT** – Page 7

28.     Defendant Drey failed to conduct an objectively, reasonable assessment of the facts when Drey chose to shoot at Kehyei.

29.     Despite the unlawful fatal shooting of Kehyei none of the Defendant Officers have been terminated.  Upon information and belief, none of the Defendant Officers were ever disciplined or required to attend any additional training.

30.     The actions of Defendant Drey tragically took Kehyei's life and are the logical and unconstitutional consequence of HPD's odious and illegal pattern, practice, custom, and de facto policies of using unreasonable and unjustifiable force on unarmed suspects who fail to obey commands.

31.     HPD did not provide adequate training to Defendant Drey on proper de-escalation procedures and techniques; nor were HPD officers provided with proper training needed to engage in less than lethal force (e.g., taser guns and canines).

32.     HPD did not provide adequate training to the Defendant Officers on appropriate methods and techniques to control situations similar to the one encountered by him and other responding officers on August 26, 2020.

33.     Houston Mayor and then Chief Acevedo, the City's final policymakers, and the City knew or should have known that the training provided to the Defendant Officers was inadequate or nonexistent.

34.     Defendant Drey's unlawful and unwarranted acts, lack of training, and the official customs or policies of HPD were the proximate causes of Kehyei's death.  The City ratified the wrongful acts of the Defendant Drey. Despite awareness that Defendant Officers' wrongful acts violated Kehyei's constitutional rights, the City failed to discipline Drey.

**PLAINTIFFS' ORIGINAL COMPLAINT** – Page 8

35.     At all times material hereto, the Defendant Officers were believed to be acting in the scope of their employment as agents, servants, and employees of HPD, a part of Defendant City within its executive branch, and were performing a governmental function.

36.     Moreover, no reasonably competent officer would have concluded that the actions of Defendant Drey, described herein, would not, and did not, violate Kehyei's constitutional rights. In other words, no reasonably prudent police officer under similar circumstances could have believed that Defendant Drey's conduct was justified.

37.     Defendant City and HPD have a longstanding record of not providing HPD officers with adequate training, adequate supervision, or discipline, not preventing excessive force and extrajudicial killings by HPD officers and ratifying the wrongful conduct of officers. Then Chief Acevedo knew that there were training issues which resulted in the killing of Kehyei.  The Defendant Officers' inadequate training and the unconstitutional use of force policy were a moving cause in the death of Kehyei.  Despite the number of internal affairs complaints lodged against city of Houston police officers for misconduct, HPD continues to cover-up bad acts and ratify the actions of its police officers as it now attempts to do with this case.

38.      The City of Houston Police Department has a long and documented history of abiding instances of excessive force in a wide variety of circumstances, both in that officers routinely use more force than is necessary in a given situation, and in that the City will keep evidence and investigations out of the public eye and let offending officers continue to serve with no consequences. The latter custom of turning a blind eye to excessive force emboldens officers to use any amount of force with prejudice, and without fear of professional repercussions.

Plaintiffs provide these numerous examples, dating back decades, of uses of excessive force that have gone almost completely unpunished and unaddressed by HPD, to illustrate just how pervasive and long-standing this culture and pattern of excessive force is in the HPD.

39.     This culture and pattern of abiding and secreting away instances of excessive force was known and perpetuated by then Chief Acevedo.  Chief Acevedo and high ranking HDP officers have routinely kept information and videos of shootings in Houston internal, except for summaries of the events that best suited the City's image. One of those instances described the victim as charging at the police when he was shot, whereas later-released cell phone footage showed him on his knees when he was shot. This issue was well covered by reputable national news outlets such as NBC News, as well as local outlets such as the Houston Chronicle (exemplary articles found in hyperlinks). As the Houston Chronicle put it: "None of Houston's six shooting seem to rise to the egregious level of abuse and brutal indifference that caused the death of George Floyd in Minneapolis, but history and the persistent pattern of such tragedies has taught us not to rely exclusively on Acevedo's verbal assurances."

40.     Around FOUR HUNDRED FIFTY (450) HPD officers have been involved in the killing or wounding of civilians since January 1, 2004, yet not one HPD officer has been indicted when HPD Homicide Division's collected evidence and conclusions were presented to Harris County Grand Juries. Furthermore, there is no evidence that since January 1, 2004, a single HPD officer has been disciplined for a City policy violation due to shooting a civilian after the HPD Internal Affairs Department investigation into the shooting.[2]   About 25% of these shootings

---

[2]  The police shooting of Nicolas Chavez on April 21, 2020, resulted in four police officers being fired four months later. However, the grand jury did not indict the officers and they were recently reinstated to their former positions with back pay.

involved citizens with no weapons.

41.     In December 2016 new Houston Police Chief Acevedo stated he was creating a special HPD unit apart from homicide to investigate situations such as shootings of civilians.

42.     On October 1, 1998, HPD Officers Anthony M. Ruggeroli and Brian T. Mitchel shot at suspects in a stopped car when they did nothing more than not respond immediately to verbal commands. Officer Ruggeroli merely shouted a few commands then left cover and went to the passenger window and shot at the unarmed driver. Officer Mitchel than ran up to the *passenger window, smashed it,* and grabbed the passenger. The officers were not disciplined for using excessive force nor retrained in use of force or the proper high risk vehicle approach tactics, indicating ratification and acceptance of patterns, practices, customs and/or procedures of the excessive use of force.

43.     In 1999, HPD Sgt. Glover's gun went off and struck a suspect when he used it to bash in the passenger side window. Officer Shockley then discharged his weapon striking the other suspect in the vehicle. Despite using excessive force on both suspects and failure to use safe high risk vehicle approaches and full IAD investigation, there was no discipline or retraining as a result of this incident, indicating ratification and acceptance of HPD's excessive use of force and dangerous and unconstitutional high-risk vehicle approach (felony stop) patterns, practices, and customs.

44.     In 1999, Jason Arboleda was shot and killed by HPD Officer R. A. Williams. Jason had left a Houston bar with his friend Franky Aguirre, who was a passenger. On the way out from the area he struck, but did not seriously injure, Officer R. A. Williams. Officer Williams then chased after Mr. Arboleda on foot and stopped him at a traffic light as Mr. Arboleda tried to

flee in his vehicle. Officer Williams ordered Mr. Arboleda out of the car and on to the ground to which Mr. Arboleda complied. At that point, Officer Williams did *not* handcuff or otherwise secure Mr. Arboleda, who then jumped back in his car. The officer ran to the front of the car instead of obtaining cover. As Mr. Arboleda drove forward, Officer Williams shot and killed him. Officer Williams was not hit by the car and even felt safe enough to shoot rather than getting out of the way. Despite IAD investigation, Officer Williams was not disciplined or retrained in the use of excessive force or high-risk vehicle approach. The City determined it was a justified shooting and it never addressed Officer Williams' failure to follow either the written HRVA policy or any safe HRVA method. Further, the City did not order any training, indicating ratification and acceptance of HPD's dangerous and unconstitutional high-risk vehicle approach (felony stop) patterns, practices, customs and/or procedures and use of force.

45.     In 2000, HPD Officer R. C. Headley stopped a vehicle and determined it was stolen. Officer Headley then shot Mr. Langston (driver) and Mr. Plumbar (passenger) when there was no reason to do so. Neither person was armed. Despite IAD investigation, there was no discipline nor training ordered.

46.     In 2000, Officer Selvyn J. Ellis, who had forty-seven sustained complaints against him, received a suspension instead of firing, despite the fact he refused to answer questions during an IAD inquiry into improper conduct, including allegations of assault. He had previously been suspended for injuring a bar patron while working an extra job and not reporting the use of force.

47.     In 2002, Officer Ted A. Adams, who had forty-one sustained complaints against him at the time, received a one-day suspension instead of firing for not reporting the use of force

after injuring a female by knocking her to the pavement with a leg sweep.

48.     In 2003, Houston Police Lieutenant Hillman was involved in a faulty high-risk vehicle approach and used excessive force against unarmed Kevin Lunsford. When Hillman got near Lunsford, he claimed that Lunsford moved, resulting in then Lt. Hillman shooting and killing Lunsford. Despite IAD investigation, there was no discipline for excessive use of force, or any training required.

49.     On October 31, 2003, HPD Officer Butler was working at a large AMC movie theater in west Houston when 15-year-old Jose Vargas was purportedly playing his radio too loud in his vehicle on his way to see a movie with his three teenage friends. Officer Butler went to investigate, and the kids left. Officer Butler claimed the kids did not obey his commands to stop so he then gave pursuit. Vargas was scared and drove off. Officer Butler rushed up to the vehicle on foot when it was stopped in traffic with his gun drawn and not under any cover. This startled the 15-year-old unarmed Vargas and the vehicle lurched forward with Officer Butler at the side of the driver's window. Officer Butler then shot and killed Vargas. Vargas had no criminal history. Despite the obvious excessive use of force and IAD investigation, Officer Butler was not disciplined nor retrained in the use of force.

50.     In 2003, Mr. Juan Lozano was killed because HPD Officer R. L. Plotner used faulty high risk vehicle approach techniques by approaching a vehicle and failing to take cover and give verbal commands to Lozano. Without being in fear of his life or serious bodily injury, Plotner shot and killed Lozana. Officer Plotner was not disciplined or retrained in proper high risk vehicle approach tactics nor excessive use of force, indicating ratification and acceptance of HPD's dangerous and unconstitutional high-risk vehicle approach (felony stop) patterns, practices, customs and/or procedures similar to those that killed Roland.

51.     In 2003, HPD Officer Rivera made a felony stop of a suspect in a van.  Instead of taking cover and shouting verbal commands, Officer Rivera left cover and approached the van exposed. Officer Rivera shot the van driver when he was not frightened for his life. Officer River, however, should have maintained cover and a position of advantage. Officer Rivera was not disciplined or retrained for use of excessive force despite IAD investigation.

52.     In 2004, HPD Officer C. Pena Jr. shot and seriously wounded an unarmed 16-year-old girl who was under a vehicle. Officer Pena gave verbal commands to LaDonna Banks and then shot her. Officer Pena received no discipline and no additional training on how to deal with suspects nor did receive any additional training on the use of excessive force.

53.     In 2005 HPD Officer Thompson used faulty high-risk vehicle approach techniques and excessive force resulting in the shooting of an unarmed suspect, Timothy M. Thomas, who was driving when Officer Thompson pulled him over. Officer Thompson became suspicious because the driver was black, and he had heard of a black felony burglary suspect. At first, Officer Thompson was behind cover and used his bullhorn. This only lasted a few minutes and then the officer left cover and approached the vehicle with his gun drawn. Mr. Thomas started to get out of the car and when he did, he was shot by Officer Thompson who said he was in fear of his life due to Mr. Thomas' innocent movements. Thomas had no gun. Officer Thompson obviously used excessive force and a faulty high risk vehicle approach. Officer Thompson was not disciplined and there was no training despite a full HPD IAD investigation.

54.     On August 14, 2007, a 17-year-old, unarmed girl was seriously wounded because of a faulty high risk vehicle approach. Brittanee King, 17, was a *littering* suspect who had fled in a car for a short distance and was pursued by HPD Officer Carraway approached her with gun drawn. When Brittanee stopped the vehicle to comply with the officer, Officer Carraway failed to

use safe HRVA methods and left cover and exposed himself in full view of the young, unarmed girl in the car. When Brittanee made an innocent movement, Officer Carraway claimed he feared for his life because he was not behind cover and in a position of advantage and shot Brittanee, wounding her. Officer Carraway claimed he saw a shiny object - Brittanee was wearing shiny bracelets. Despite the admission of unsafe HRVA approach methods and the use of excessive force, no discipline or training was administered despite an IAD investigation

55.     In 2008 Charles Chukwu was arrested and taken to the City of Houston jail at Mykawa Road where he was beaten by at least one City of Houston jailer without any lawful reason. After the beating, Mr. Chukwu was purposefully released before he could get the names of the jail inmate witnesses. The jailers failed to file a timely use of force report and did not stop the beating of Mr. Chukwu, nor did the Houston jailers report another Houston jailer for the obvious excessive force. The jailers refused to take Mr. Chukwu to the jail clinic or hospital where the injuries could be documented, despite the excessive use of force and obvious injures.

56.     The Chukwu incident was caught on videotape and investigated by the HPD IAD. The IAD failed to find any violations when, in fact, excessive force had been used against Mr. Chukwu. Mr. Chukwu requested the videotape from former City Mayor Bill White, the Houston City Council and the HPD IAD, but was refused. At a Houston City Council meeting, Councilman Adrian Garcia stated that the videotape should be released. City Council member Sue Lovell asked the HPD IAD about the Chukwu jail beating video, however, she never received a copy of the Chukwu video. More than two years after the alleged beating, Mr. Chukwu had not received the beating videotape.

57.     On June 22, 2008, Henry Lee Madge was struck several times, while in

handcuffs, by a Houston police officer without justification and the officer was not disciplined.

58.     Around February 6, 2009, Trenton Garrett was arrested and taken to the Houston jail at Mykawa Road where City of Houston jailers beat him without any reason. The jailers failed to file a timely use of force report and did not stop the beating of Mr. Garrett, nor did the Houston jailers report another Houston jailer for the obvious excessive force. The jailers refused to take Mr. Garrett to a hospital where the injuries could be documented despite the excessive use of force and obvious injures. The incident was caught on videotape and investigated by the Houston IAD which failed to find any violation, when in fact, excessive force had been used against Mr. Garrett. Mr. Garrett asked for the videotape from the HPD IAD but was refused. More than two years after the alleged beating, Mr. Garrett has not received the beating videotape.

59.     On August 5, 2009, Hatice Cullingford, Ph.D. ("Dr. Cullingford"), 65, was arrested by a Houston Police officer. Dr. Cullingford had never been convicted of any crime in her life and never previously been arrested for any crime. At the City of Houston's Mykawa jail, Houston jail employees used excessive force on Dr. Cullingford, yet no discipline resulted.

60.     In the late Spring of 2010, 15-year-old Chad Holley was purposefully struck by a Houston police squad car and then violently beaten--kicked, stomped, and punched in the head, groin, and other parts of his body--by at least four Houston police officers while other Houston police officers looked on without intervention. Chad Holley was not resisting and laid down on the ground with his hands behind his back. No officer attempted to stop the beating by the other officers and after the beating no officer reported any other officer for the incident. No use of force report was filled out by any officer in a timely manner. The Mayor of Houston,

Annise Parker, thereafter, would not allow the release of a videotape showing the incident to the public.

61.     In February 2011, a videotape of the Chad Holley beating was released to local Houston television station KTRK, Channel 13, by a Houston citizen. Then Houston City Mayor Annise Parker threatened the citizen and berated KTRK Channel 13 by stating "Whoever provided the video to Channel 13 would be in violation of a federal court order and should be prosecuted." The citizen was not a party to the lawsuit nor was any protective order directed at the citizen.

62.     In September 2018, Defendant Drey was involved in an officer involved shooting that resulted in the death of Ronald Singletary.  Despite there being multiple officers on the scene, Defendant Drey was the only officer to fire his duty weapon.  Upon information and belief, Defendant Drey was not disciplined, nor did he receive any additional training or counseling after the incident.

63.     On February 8, 2011, at a Houston City Council public meeting discussing the Chad Holley excessive force incident and past police excessive force incidents, Houston City Attorney David Feldman interrupted Houston City Council member Melissa Noriega, who was talking about the videotape of Holley and past instances of police brutality that could affect city liability. Mr. Feldman then instructed the City Council to not talk about the Chad Holley case. This was a sentiment Mayor Parker also verbalized. Council member Noriega agreed and stopped talking about excessive force events as did the Mayor and other City Council members. For the past twenty years, there have been excessive force cases against the City, so under this policy the council members are not allowed to speak about excessive force cases in public meetings.  The

police involved shootings and killings by HPD continue in 2022.[3]

64.     Defendant Drey's unlawful and unwarranted acts, lack of training and the official customs or policies of HPD caused Kehyei's wrongful death.

65.      Plaintiffs would also show that at all times material hereto, Defendant Drey was acting under the color of law when he shot and killed Kehyei.

66.     Plaintiffs would further show that the Defendant Officers' actions were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures of HPD in regard to the use of deadly force. The City and the Policymakers, specifically, then Chief Acevedo knew or should have known but never provided the requisite and proper training nor did he discipline officers for their wrongful acts.

67.     As a direct and proximate result of the Defendants' conduct, the Plaintiffs have sustained substantial damages and pecuniary loss.

68.     Kehyei was twenty-nine (29) years old when Defendant Drey killed him.  Kehyei was in good health, with a reasonable life expectancy of living at least 50 more years to age 79. Kehyei leaves behind his minor daughter, Mother and Stepfather.

69.     The Plaintiffs have suffered pecuniary losses from the death of Kehyei by virtue of the destruction of the parent-child relationship, including the right to love, affection, solace, comfort, companionship, society, emotional support, and happiness.  The Plaintiffs will suffer anguish, grief, and sorrow as a result of Kehyei's death and is likely to continue to suffer for a long time in the future. The closeness of Plaintiffs' relationship with Kehyei is demonstrated in many ways including the time they spent together, and the things Kehyei did for his minor

---

[3] See article noting thirty-four police involved shootings by HPD as of May 18, 2022: 2022 Reported Law Enforcement-Involved Shootings.

**PLAINTIFFS' ORIGINAL COMPLAINT** – Page 18

daughter and parents.  For these losses, the Plaintiffs seek damages in a sum in excess of the minimum jurisdictional limits of the court.

70.     Upon information and belief, HPD has not implemented policies and procedures to aggressively curtail death and/or injuries as a result of the improper use of deadly force and has not disciplined the officer who was involved in the unlawful shooting death.

## VI.

## CAUSES OF ACTION

**First Cause of Action**
**Unconstitutional Use of Excessive Force**
**42 U.S.C. § 1983 Violation of the Fourth Amendment**
**by Defendant K. Drey**

71.     Plaintiff hereby adopts, incorporates, re-states and re-alleges paragraphs 1 through 70, inclusive, with regard to all causes of action.

72.     Defendant Drey, with the assistance of the John Doe Officers, acting under color of law, used unreasonably excessive and deadly force when he fired upon and killed Kehyei for no lawful reason. Kehyei had not threatened to do harm to the officers or anyone else.  Defendant Drey's story that after speaking to officers for over thirty minutes while on the fence, Kehyei then pointed a gun at officers is belied by the fact that Defendant Drey only shot one time, no other officers fired their weapons, and the alleged weapon was never found even though the scene was secure.

73.     Defendant Drey's actions violated Kehyei's constitutional rights giving rise to Plaintiffs' claims pursuant to the Fourth Amendment and 42 U.S.C. §1983 and other applicable laws.

74.     Defendant Drey violated Kehyei's constitutional rights to be free from excessive and deadly force. This right was clearly established at the time of the shooting.

75.     Defendant Drey's actions were not objectively reasonable because Kehyei did not pose an immediate risk of serious physical harm to any officers or any other person.

76.     The force used by Defendant Drey was objectively unnecessary, excessive, and unreasonable under the circumstances, as Kehyei did not pose an immediate threat to the safety of Defendant Drey, or others and the use of such excessive and deadly force was unnecessary. Rather, Defendant Drey embarked on a willful, malicious, reckless, and outrageous course of conduct that was intended to cause and, in fact, caused Kehyei to suffer excruciating pain.

77.     Further, Defendant Drey's conduct violated a clearly established constitutional right—the right to be free from excessive force—that was established well before Defendant Drey shot and killed Kehyei.  *See, e.g., See, e.g., Reyes v. Bridgewater,* 362 Fed. Appx. 403, 409 (5th Cir. 2009) ("The cases on deadly force are clear: an officer cannot use deadly force without an immediate serious threat to himself or others."). More specifically, the right to be free from the use of excessive force was clearly established under the particular circumstances presented to the Defendant Officers.  *See Lytle v. Bexar Cty., Tex.,* 560 F.3d 404, 417–18 (5th Cir. 2009) ("It has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others."); *See also*, *Tennessee v. Garner,* 471 U.S. 1, 3, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ("deadly force may not be used unless it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.").

78.     As a result of these Constitutional violations to Kehyei, Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

**Second Cause of Action**
**Houston's Failure to Adopt a Needed Policy and**
**Failure to Train and Adequately Supervise or Discipline**
**42 U.S.C. § 1983 Violation of the Fourth Amendment**
**<u>Against Defendants City and then Chief Acevedo</u>**

79.     Plaintiffs hereby adopt, incorporate, re-state, and re-allege paragraphs 1 through 78.

80.     The City is liable for all damages suffered by the Plaintiffs pursuant to *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978) and 42 U.S.C. § 1983, based on an official policy or custom of the Houston Police Department of which the Policymakers all had actual or constructive knowledge that was a moving force behind the constitutional violations alleged herein.

    **A.**    **The City's written policies on the use of force are facially unconstitutional and were a moving force behind violating Kehyei's constitutional right to be free from excessive force.**

81.     The Plaintiff incorporates paragraphs 1 through 80 as if fully set forth herein. Prior to the incident, the Policymakers knew of the excessive use of force being used by HPD police officers but did nothing to curtail it.

82.     HPD policies on the use of force instruct officers that the degree of non-deadly force is objectively reasonable even when based on the officers' subjective evaluation and that officers may even use deadly force when no immediate threat of harm actually exists. Because

both policies directly contradict what the United States Supreme Court has determined are the constitutional limits of the use of force, the policies on the use of force are facially unconstitutional.

83.     Deadly force is not justified where the suspect does not pose a "live threat" to the officers in question.  *Peroza-Benitez*, 994 F.2d at 171 n.7.   The United States Supreme Court has not interpreted the constitution to justify using deadly force when the officer simply believes that a threat exists, even if the belief is reasonable. Thus, unless the suspect <u>actually poses</u> an <u>immediate</u> threat, the officer's <u>belief</u> that a suspect posed a threat alone does not justify using deadly force. A policy that instructs officers that they may use deadly force when they reasonably believe a threat exists, regardless of whether the threat actually exists and regardless of whether the threat is immediate, violates the constitutional limits on the use of force.

84.     Furthermore, the United States Supreme Court has concluded that the objective "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene"—not based on the particular officer's subjective evaluations. *Graham*, 490 U.S. at 396. Thus, in determining what degree of force is appropriate, officers may not consider subjective criteria, such as their own age, size, strength, skill level with department weapons, or state of health. A policy that defines "objective reasonableness" to include such subjective criteria, therefore, violates the constitutional limits on the use of force.

85.     Policies that ignore the United States Supreme Court's interpretation of the Constitution are facially unconstitutional. *See Monell*, 436 U.S. 658.

86.     Defendant Drey acted on the City's facially unconstitutional polices on the use of force when he used excessive deadly force against Kehyei, causing Kehyei's death. Defendant Drey was unjustified in using deadly force against Kehyei because he did not pose any actual,

<u>**PLAINTIFFS' ORIGINAL COMPLAINT**</u> – Page 22

immediate threat to officers or others. Defendant Drey's actions were objectively unreasonable and violated Kehyei's Fourth Amendment. Therefore, HPD's use-of-force policies were moving forces behind Plaintiffs' constitutional injuries.

**B.    The City and then Chief Acevedo failed to train its officers on the proper use of force, including deadly force.**

87.    Plaintiffs incorporate by reference paragraphs 1 through 86 as if fully set forth herein.  Prior to August 26, 2020, the Policymakers knew or should have known that HPD officers exhibited a pattern of escalating encounters with the public.

88.    Defendant Drey was acting under the color of law and acting pursuant to customs, practices and policies of the City and HPD in regards to the use of deadly force as authorized and/or ratified by these Policymakers when he deprived Kehyei of rights and privileges secured to him by the Fourth Amendment to the United States Constitution and by other laws of the United States, by the City failing to provide proper training in the use of deadly force in violation of 42 U.S.C. § 1983 and related provisions of federal law and in violation of the above cited constitutional provisions.

89.    With respect to the claims made the basis of this lawsuit, the City and HPD failed to adequately train, supervise or discipline its employees regarding the unnecessary use of deadly force. The failure to train, supervise or discipline its employees in a relevant respect reflects a deliberate indifference to the City and then Chief Acevedo to the rights of the City's inhabitants and is actionable under 42 U.S.C. § 1983.

90.    Defendants City and former Chief Acevedo developed and maintained a policy of deficient training of the police force in the use of force, including the use of deadly force in the apprehension of individuals.  The City's training was designed and implemented by then

Chief Acevedo to act in this regard.

91.     The City and then Chief Acevedo's failure to provide adequate training to its police officers regarding the use of deadly force and wrongful arrest/detentions reflect deliberate indifference by the Policymakers and reckless and conscious disregard for the obvious risk that officers would use excessive or deadly force on citizens and made the violations of Kehyei's constitutional rights, including Kehyei's death, a reasonable probability.

92.     Plaintiffs would show that Defendant Drey's actions were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures for which the City and then Chief Acevedo knew or should have known but never provided the requisite and proper training.

93.     On information and belief, the Defendants, acting through official policies, practices, and customs, and with deliberate, callous, and conscious indifference to the constitutional rights of Kehyei, failed to implement and/or enforce the policies, procedures, and practices necessary to provide constitutionally adequate protection to Kehyei when he was confronted by HPD officers, more specifically Defendant Drey.  The Defendant City and then Chief Acevedo implemented policies, procedures, and practices which actually interfered with or prevented Kehyei from receiving the protection he deserved.

94.     For instance, the following conduct, policies, and customs, *inter alia*, by the Defendants violated Kehyei's constitutional rights:

(a)     The inadequacy of HPD policies, training, supervision, or discipline relating to the use of deadly force;

(b)     The inadequacy of HPD's policies, training, supervision, or discipline relating to the use of non-lethal control devices and tactics;

(c)   The adoption of completely subjective continuum of force policies that can be expressly avoided, and which leaves the use of deadly force exclusively to the unchecked discretion of officers on the scene;

(d)   The adoption of a policy that allows officers to use the degree of force that the officer feels brings the situation quickly under control as per his or her individual judgment even if that method is deadly force;

(e)   Lack of training regarding effective communication with citizens while giving them commands and determining their compliance; and

(f)   Using deadly force against Kehyei although he caused no immediate threat.

93.    In addition, Defendants City and then Chief Acevedo failed and refused to implement customs, policies, practices, or procedures, and failed to train its personnel adequately on the appropriate policies, practices, or procedures regarding the use of deadly force. In so doing, Defendants City, the Houston City Council and then Chief Acevedo knew that they were acting against the clear dictates of current law and knew that as a direct consequence of their deliberate decisions, the very situation that occurred -- *i.e.*, Kehyei's death-- in all reasonable probability would occur.

94.    The City and then Chief Acevedo's failure to properly train, supervise and discipline its police officers regarding the use of force was the proximate cause of the violations of Kehyei's constitutional rights including the unnecessary taking of Kehyei's life.

**C.    The City failed to adequately supervise or discipline its officers for violent, aggressive, excessive force and wrongful arrest and detention and, in failing to do so, ratified and encouraged the conduct of its officers, including that of Defendant Drey.**

95.    Plaintiffs incorporate by reference paragraphs 1 through 94 as if fully set forth herein.

96.    On Plaintiffs' governmental liability claim against the City for failing to

supervise and/or discipline its officers for prior violations and the resulting lack of supervision:

(a)     the City and then Chief Acevedo failed to adequately supervise and/or discipline its employees in handling usual and recurring situations with which they deal;

(b)     the City and then Chief Acevedo were deliberately indifferent to the need to supervise and/or discipline its officers and/or employees adequately;

(c)     the failure to adequately supervise and/or discipline its officers proximately caused the deprivation of Kehyei's constitutional rights; and

(d)     the City and then Chief Acevedo failed to adequately supervise and/or discipline Defendant Drey for shooting Kehyei for no lawful reason, resulting in the death of Kehyei.

97.     Despite having knowledge of Defendant Drey's violation of HPD's policies and other best police practices as described above, Defendants City and then Chief Acevedo refused to adequately discipline Drey. The City's Policymakers were aware of the out-of-control behavior of Defendant Drey but failed to take any action.  The City's failure to adequately supervise and/or discipline its officers was therefore the moving force behind Plaintiffs' damages.

98.     The City, HPD, then Chief Acevedo and the Mayor have failed to adopt needed policies and/or have inadequate policies of training officers regarding the following areas of law enforcement:

(a)     The use of excessive and deadly force.

(b)     The provision of and proper use of non-lethal methods.

(c)      Proper de-escalation techniques.

(d)     Interacting with suspects.

99.     Defendant Drey and other officers at the scene of the shooting incident were acting under the color of law and acting pursuant to customs, practices, and policies of the City,

HPD and then Chief Acevedo in regard to the use of deadly force as authorized and/or ratified by the mayor and then Chief Acevedo.  Kehyei was deprived of rights and privileges secured to him by the United States Constitution and by other laws of the United States, by the City failing to adopt needed policies providing for the use of less-lethal means.  The City also failed to provide proper training, adequate supervision, or discipline in dealing with individuals such as Kehyei in violation of 42 U.S.C. §1983 and related provisions of federal law and in violation of the above cited constitutional provisions.

100.    The City's policy of inadequate and improper training of police officers on the proper use of deadly force, in addition to the failure to adopt a policy providing for less-lethal alternatives, resulted in the constitutional deprivations and damages alleged herein.

101.    The City and HPD failed to adequately train and failed to adequately supervise or discipline Defendant Drey despite his unlawful conduct.

102.    Defendant Drey's lack of training and failure to adopt an adequate policy providing for less-lethal means led to the use of excessive and deadly force and, ultimately, his killing of Kehyei.

103.    HPD has not provided officers with adequate training on de-escalation techniques intended to prevent instances of excessive and deadly force and extrajudicial killings.

104.    As noted above, Defendants Drey used excessive and deadly force for no lawful reason when he shot and killed Kehyei.

105.    Plaintiffs would show that at all times material hereto, Defendant Drey was acting individually and/or in the scope of his employment as an agent, servant, and employee of the HPD, were performing a governmental function.

106.     The City failed to adopt the needed policies and lacked proper training.  Through Defendant Drey's unlawful and unwarranted acts, the City caused Kehyei's wrongful death.

107.     Plaintiffs would further show that Defendant Drey's actions were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures of the HPD in regard to the use of deadly force for which the Houston Mayor and then Chief Acevedo, knew or should have known, but never provided the requisite and proper training.

108.     Moreover, no reasonably competent official would have concluded that the actions of Defendant Drey described herein would not violate Kehyei's constitutional rights. In other words, no reasonably prudent police officer under similar circumstances, could have believed that Defendant Drey's conduct was justified.

109.     As a direct and proximate result of Defendants' conduct, the Plaintiff has sustained substantial damages and pecuniary loss.

110.     As a direct cause and result of the constitutional violations as set forth herein, Kehyei incurred extreme pain, injuries and, ultimately, death for which the Plaintiffs seek compensation, as set forth more specifically in the section of this Complaint entitled "Damages."

### Third Cause of Action
### Aggravated Assault Against Defendant Drey

111.     Plaintiffs incorporate by reference paragraphs 1 through 110 as if fully set forth herein.

112.     A defendant is liable for aggravated assault if the defendant acted intentionally, knowingly, or recklessly.

113.     The defendant made contact with the plaintiff's person by using a deadly weapon during the commission of the assault.

114.    The defendant's contact caused serious bodily injury to the plaintiff.

## VII.
## DAMAGES

115.    **Actual damages.**  Plaintiffs incorporate by reference paragraphs 1 through 114 as if fully set forth herein.  Defendants' acts and/or omissions were a proximate cause and the moving force behind the following actual damages suffered by the Plaintiffs and the Defendants should be held jointly and severally liable for the following damages:

**(a)      Estate of Julius Paye Kehyei (Survival Claim).**

1.    Conscious pain and mental anguish suffered by Julius Paye Kehyei prior to his death; and
2.    Funeral and burial expenses.
3.    Loss of value of life.
4.    Exemplary Damages.

**(b)      Delores Samuel (as a wrongful death beneficiary of Julius Paye Kehyei).**

1.    Mental anguish—the emotional pain, torment, and suffering experienced by Delores Samuel because of the death of Julius Paye Kehyei—that Delores Samuel sustained in the past and that she will, in reasonable probability, sustain in the future;

2.    Loss of companionship and society—the loss of the positive benefits flowing from the love, comfort, companionship, and society that Delores Samuel would have received from Julius Paye Kehyei had he lived—that Delores Samuel sustained in the past and that she will, in reasonable probability, sustain in the future;

3.    Pecuniary loss—loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that Delores Samuel would have received from Julius Paye Kehyei had he lived—that Delores Samuel sustained in the past and that she will, in reasonable probability will sustain in the future.

**(c)      Kyle Samuel (as a wrongful death beneficiary of Julius Paye Kehyei).**

1.    Mental anguish—the emotional pain, torment, and suffering experienced

by Kyle Samuel because of the death of Julius Paye Kehyei—that Kyle Samuel sustained in the past and that he will, in reasonable probability, sustain in the future;

2. Loss of companionship and society—the loss of the positive benefits flowing from the love, comfort, companionship, and society that Kyle Samuel would have received from Julius Paye Kehyei had he lived—that Kyle Samuel sustained in the past and that he will, in reasonable probability, sustain in the future;

3. Pecuniary loss—loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that Kyle Samuel would have received from Julius Paye Kehyei had he lived—that Kyle Samuel sustained in the past and that he will, in reasonable probability will sustain in the future.

**(d)     S.T. (as a wrongful death beneficiary of Julius Paye Kehyei).**

1. Mental anguish—the emotional pain, torment, and suffering experienced by S.T. because of the death of Julius Paye Kehyei—that S.T. sustained in the past and that she will, in reasonable probability, sustain in the future;

2. Loss of companionship and society—the loss of the positive benefits flowing from the love, comfort, companionship, and society that S.T. would have received from Julius Paye Kehyei had he lived—that S.T. sustained in the past and that she will, in reasonable probability, sustain in the future;

3. Pecuniary loss—loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that S.T. would have received from Julius Paye Kehyei had he lived—that S.T. sustained in the past and that they will, in reasonable probability will sustain in the future.

116.     **Punitive/Exemplary Damages against Defendant Drey.**   Punitive/exemplary damages are recoverable under section 1983 when the conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.  Here, the conduct of Defendant Drey was done with evil motive or intent, or at the very least, was reckless or callously indifferent to the federally protected rights of the

Plaintiffs.  As such, Plaintiffs request punitive and exemplary damages from Defendant Drey to deter this type of conduct in the future.

117.    Prejudgment and post judgment interest.

118.    Costs of court.

119.    Reasonable and necessary attorneys' fees incurred by the Plaintiffs through trial, and reasonable and necessary attorneys' fees that may be incurred by Plaintiffs for any post-trial proceedings, or appeal, interlocutory or otherwise, pursuant to 42 U.S.C. § 1988.

120.     Plaintiffs seek unliquidated damages in an amount that is within the jurisdictional limits of the court.

## VIII.

## CONDITIONS PRECEDENT

121.    Plaintiffs reserve their rights to plead and prove the damages to which they are entitled to at the time of trial.  All conditions to Plaintiffs' recovery have been performed or have occurred.

## XI.

## TRIAL BY JURY

122.    Plaintiffs have paid a jury fee and demands trial by jury.

## X.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein; that upon final trial hereof Plaintiffs have and recover judgment from Defendants; actual damages, exemplary damages, pre-judgment interest at the legal rate; interest

on said judgment at the legal rate; costs of court; and such other and further relief, both general and special, at law and in equity, to which Plaintiffs are justly entitled. Respectfully submitted,

By: /s/ DARYL K. WASHINGTON
Daryl K. Washington
State Bar No. 24013714
WASHINGTON LAW FIRM, PC
325 N. St. Paul St., Suite 3950
Dallas, New Jersey 75201
214-880-4883
214-751-6685 - fax
Email: dwashington@dwashlawfirm.com

and

By: /s/ SHERYL R. WOOD
Sheryl R. Wood
THE WOOD LAW FIRM, PLLC
1629 K St, NW, Suite 300
Washington, DC 20006
202-466-0986
202-866-0986 – fax
Email: sw@thewoodlawfirm.com
(Filing for *Pro Hac Vice* Admission)


**ATTORNEYS FOR PLAINTIFFS**